## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

ANTWAN JOVAN JACKSON,

     Plaintiff,

v.                                                   Case No.  5:19-cv-114-MCR/MJF

SERGEANT LANIER, *et al*.,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

Defendant Nurse Shively has moved for summary judgment in this section 1983 action which alleges that she was deliberately indifferent to Plaintiff's mental health emergency and threat of self-harm, in violation of the Eighth Amendment. Doc. 85. Plaintiff opposes the motion. Doc. 98. For the reasons set forth below, the undersigned recommends that Shively's motion for summary judgment be denied.[1]

### I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Antwan Jackson is an inmate of the Florida Department of Corrections currently confined at Lake Correctional Institution ("Lake CI") in

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Clermont, Florida. Jackson initiated this lawsuit on April 19, 2019, by filing a civil rights complaint under 42 U.S.C. § 1983. Doc. 1. Jackson's third amended complaint is the operative complaint. Doc. 36.

Jackson's third amended complaint names as Defendants three prison officials and a nurse at the Northwest Florida Reception Center ("NWFRC")—Sergeant Lanier, Sergeant Plybon, Officer Justice and Nurse Shively. Doc. 36 at 2. With respect to Nurse Shively, Jackson claimed that she violated his rights under the Eighth and Fourteenth Amendments on June 25, 2018—during his confinement at NWFRC—when she was deliberately indifferent to his psychological emergency and a substantial risk that he would hang himself. *Id*. at 22, 24-26. Jackson sued Shively in her individual and official capacities. *Id*. at 22. As relief, Jackson sought compensatory damages, punitive damages, injunctive relief and "any additional relief this Honorable Court deems just and proper." *Id*.

Nurse Shively moved to dismiss Jackson's claims. Doc. 62. On January 10, 2022, the District Court granted the motion in part and dismissed: (1) Jackson's due process claim; (2) Jackson's official-capacity claim; (3) Jackson's claim for injunctive relief; and (4) Jackson's references to treaties and state law. *Id*. at 2. The District court denied Shively's motion to dismiss in all other respects, and returned the case to the undersigned for further pretrial proceedings on Jackson's remaining

claim. *Id*. Jackson's remaining claim against Shively is an individual-capacity Eighth-Amendment claim for damages for Shively's deliberate indifference to Jackson's serious medical need for mental-health care, and his threat of self-harm.

Shively asserts that she is entitled to summary judgment because Jackson cannot show that she was deliberately indifferent to a strong likelihood that suicide would result, or to a serious medical need for mental health care. Doc. 85 at 4. Jackson has responded in opposition to the motion. Doc. 98.

## II.  FACTS RELEVANT TO JACKSON'S CLAIM AGAINST SHIVELY[2]

The material facts set forth below are drawn from the following sources: (1) Jackson's verified third amended complaint, Doc. 36; (2) the evidentiary materials attached to Defendant Shively's motion for summary judgment, Doc. 85, Exs. 1-3; (3) a grievance attached to Shively's earlier-filed motion to dismiss, Doc. 62, Ex. 2 at 44; and (4) Jackson's General Affidavit which was sworn before a notary public, Doc. 98, Ex. A.[3]

---

[2] These facts do not relate all the details of the incident at NWFRC—only those relevant to Jackson's claim against Shively.

[3] A verified complaint constitutes summary-judgment evidence just as if it were an affidavit. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1305 n.23 (11th Cir. 2011).

When the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the plaintiff." *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005). Matters stated as "facts" for purposes of summary judgment review may not be the actual facts. *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

On June 23, 2018, while Jackson was confined at NWFRC in Quad 1 of K-Dormitory ("Quad 1"), Defendant Sergeant Lanier approached Jackson's cell and stated: "Let me see that long dick since everyone else wants to see it, if not cut the son of a bitch, you got 18 hours." Doc. 36 at 24, ¶ I. Jackson did not comply with Lanier's request. *Id*.

The following morning, on June 24, 2018, Lanier returned to Jackson's cell and commented: "Your time is up so what you go [sic] do," then walked away. *Id*., ¶ I. At 3:00 p.m., Lanier directed another inmate to pack Jackson's property, and informed Jackson that Captain Jenkins authorized Lanier to move Jackson to Quad 4 of K-Dormitory ("Quad 4"). *Id*., ¶ I. Jackson believed that Lanier orchestrated the move because he arranged for inmates in Quad 4 to assault Jackson in retaliation for Jackson refusing to comply with Lanier's "sexual request." *Id*., ¶ I. After his property was packed, Jackson was "forced" to move to Quad 4. Doc. 98, Ex. A at 2.

Approximately 3 hours later, at 6:15 p.m., Jackson attempted to exit Quad 4 with his belongings because he was "scared for [his] life." Doc. 98, Ex. A at 2. When Jackson reached the sally port area, he told Defendant Sergeant Plybon that he had a psychological emergency and was in fear for his life. Doc. 36 at 25, ¶ II. Plybon responded, "Fuck your emergency, ain't no audio out here get your ass back in the quad!" *Id.*, ¶ II. Plybon then informed Jackson that Lanier advised him not to allow Jackson to go back to Quad 1. *Id.*, ¶ II. Plybon also told Jackson that he was "about to get [his] ass wiped" and to "take it like a man." *Id.*, ¶ II. Jackson returned to his cell in Quad 4. *Id.*, ¶ II. Jackson's cell door was locked and remained locked until the following morning. *Id.*, ¶ II.

At 3:00 a.m., on June 25, 2018, Sergeant Plybon unlocked Jackson's cell door for Jackson to report to the hallway to receive his medication. Doc. 36 at 25, ¶ II. Nurse Shively administered Jackson's medication. Doc. 36 at 25, ¶ II. Jackson takes 100 milligrams of Zoloft twice per day for depression. Doc. 85, Ex. 3, MacNeal Decl. Attach. 3 at 230; *see also id.* at 757.[4] Jackson told Shively that he was having a psychological emergency and was going to hang himself. Doc. 36 at 25, ¶ II. Shively responded: "Well hang then." *Id.*, ¶ II.

---

[4] Citations to page numbers of Jackson's medical records are according to the Bates stamp number appearing at the bottom right corner of the page.

Jackson went back to his cell, got a sheet, returned to the "front door," and informed Plybon and Shively that he was going to hang himself. *Id*. at 25-26, ¶ II. Plybon and Shively laughed at Jackson. *Id*. at 26, ¶ II. Shively, Plybon and Defendant Justice watched Jackson as he "tied the sheet to the TV stand and then around [his] neck hanging until the sheet came loose" and dropped him to the floor. *Id*. at 26, ¶ II. Plybon, Shively and Justice observed Jackson's hanging attempt but made no effort to intervene or otherwise respond. *Id*. at 26, ¶ II.

Jackson got up from the floor, went to "the door," and again tried to leave Quad 4. Doc. 36 at 26, ¶ II. Two inmates threatened Jackson, and one of the inmates struck him in the back of the head with a closed fist. Doc. 36 at 26, ¶ II. Jackson went back to his cell. Moments later, one of the same inmates entered Jackson's cell and threatened him again. *Id*., ¶ II The other inmate entered Jackson's cell and the two punched and kicked Jackson. *Id*., ¶ II. A third inmate joined the assault on Jackson and stated, "This is for Lanier." *Id*., ¶ II.

During the assault in Jackson's cell, Jackson attempted to escape, but one of his attackers slammed the cell door closed. *Id*. at 26-27, ¶ III. After Jackson was assaulted, one of his attackers told an inmate in the dayroom to tell Justice to open Jackson's cell door. *Id*. at 27, ¶ III. Jackson's cell door immediately opened, and Jackson and his assailants exited the cell. *Id*., ¶ III. Jackson approached the "front

door" of Quad 4, and Justice immediately opened it to allow Jackson to exit Quad 4 and enter Quad 1. *Id.*, ¶ III.

A few minutes after Jackson entered Quad 1, Justice allowed one of Jackson's attackers to enter Quad 1. Doc. 36 at 27, ¶ III. That inmate found Jackson, threatened him, and attempted to stab him with a homemade knife. *Id.*, ¶ III. A few minutes later, Justice allowed another inmate from Quad 4 to enter Quad 1. *Id.*, ¶ III. That inmate threatened Jackson, exited Quad 1, and then returned to Quad 4 where he assaulted Jackson in the dayroom. *Id.*, ¶ III.

After the assaults, Justice "called in" Jackson's psychological emergency. *Id.*, ¶ III. Justice allowed Jackson to secure himself in the front entrance between the "front door" and the "grill gate." *Id.*, ¶ III.

At 5:00 a.m. on June 25, 2018, Jackson was taken to the medical department where he was assessed by Licensed Practical Nurse C. Dalton. Nurse Dalton performed a "Mental Health Emergency Protocol." Doc. 85, Ex. 3, MacNeal Decl. Attach. 3 at 758. Dalton's objective assessment described Jackson as "quiet," with a "depressed" affect. *Id.* at 758. Dalton reported that Jackson had ideas of self-injury, specifically, "attempted hanging." *Id.* at 758. Concerning "Threats," Dalton reported: "homicidal thoughts." *Id.* at 758. Concerning "Plan," Dalton reported: "kill myself first." *Id.* at 758. Dalton determined that "there may be risk of injury to self

or others." *Id*. at 759. Dalton contacted a clinician, completed a "Staff Request/Referral to Mental Health," and placed Jackson in an infirmary isolation management room to prevent self-injury and to provide protection and observation. *Id*. at 759.

During that visit, Dalton also performed a "Head Trauma Protocol." Doc. 85, Ex. 3, MacNeal Decl. Attach. 3 at 230. As part of the subjective assessment, Dalton noted that Jackson described a 1½-foot fall caused by attempted hanging. *Id*. at 230. Jackson indicated that his injury was not witnessed. *Id*. at 230. Jackson reported that he had a headache and that he lost consciousness on scene for a "couple seconds." *Id*. at 230. Nurse Dalton noted a hematoma and laceration to Jackson's left eyebrow. *Id*. at 230, 758. Jackson's vital signs and neurological assessment were normal.

At 5:30 a.m. on June 25, 2018, Psychologist M. Mason admitted Jackson as an inpatient to Self-Harm Observation Status ("SHOS"). *Id*. at 756. The admitting diagnosis was "suicidal ideations, self-reported attempted hanging." *Id*. at 756.

At 6:58 a.m. Jackson had a counseling session with MHP Reginald Jones. *Id*. at 787-88. During the evaluation, Jackson stated: "I do got a psych emergency, they moved me to another quad and some inmates jumped on me so I declared a psych emergency." *Id*. at 787. MHP Jones noted as environmental concerns: "situational stress/environmental stress." *Id*. at 787. Jones provided Jackson counseling and

assessed the current risk for suicide or self-harm as low. *Id*. at 787-88. When Jones asked Jackson to describe his hope for the future, Jackson responded, "I don't know, I think some programs may help me, maybe another dorm or another camp." *Id*. at 788.

At 8:40 a.m. on June 26, 2018, Jackson had a counseling session with Psychologist Mason. *Id*. at 783-84. Jackson stated to Mason that he was the "same as yesterday" and that he was "trying to get to CSU [Crisis Stabilization Unit]." *Id*. at 783. Jackson denied suicidal ideations and homicidal ideations. *Id*. at 783. Mason noted that Jackson expressed a desire to continue with his PREA allegations and to work with security to resolve the issue. *Id*. at 784. Jackson also expressed a desire to "go to Wakulla & get treatment." *Id*. at 784. Mason assessed Jackson's current risk for suicide or self-harm as low, and discharged him from SHOS with a follow-up evaluation in 7 days. *Id*. at 784.

Before Jackson was discharged, he reported to a correctional officer making his rounds (Captain Martin) that he had a P.R.E.A. allegation to report. Doc. 36 at 29, ¶ V. Jackson related his allegation concerning Defendant Lanier's sexual comment. *Id*., ¶ V. Registered Nurse A. Peters conducted the "Alleged Sexual Battery Protocol." Doc. 85, Ex. 3, MacNeal Decl. Attach. 3 at 232. Jackson reported to Nurse Peters: "Sergeant Lanier said I want to seek your dick." *Id*. at 232. Jackson

Page 9 of 24

stated that he did not carry out Lanier's request and, as a result, was moved to a different dorm where he was "jumped on by other inmates" the day after placement. *Id*. at 232. Peters ordered a "Mental Health Referral." *Id*. at 233.

Jackson was released from SHOS on June 26, 2018, with the notation that he had "improved." *Id*. at 756.

On June 27, 2018, Jackson submitted a sick call request complaining of "broken ribs, trouble breathing, chest-pains, black eye, swol[l]en eye, double vision, knee pains, back pains, nosebleed, neck pains." Doc. 85, Ex. 3, MacNeal Decl. Attach. 3 at 229. Jackson reported that his symptoms started "Monday June 25th after I was assaulted." *Id*. at 229.

On June 28, 2018, Jackson went to sick call and reported pain in his left ribs, back and neck, as well as head trauma as a result of being assaulted. Doc. 85, Ex. 3, MacNeal Decl. Attach. 3 at 225, 227. Jackson attributed his injuries to the inmate assaults. *Id*. at 225, 227. The nurse performed back pain and head trauma protocols. *Id*. at 225-28. The nurse noted slight swelling to Jackson's left ribs, but no swelling to his back and no bruising. *Id*. at 225. The nurse also noted bruising under Jackson's right eye. *Id*. at 227. The examination otherwise was unremarkable. The nurse prescribed analgesic balm, Motrin and Tylenol, and instructed Jackson to return if his symptoms worsened. *Id*. at 226, 228.

On June 30, 2018, Jackson submitted an informal grievance, in which he complained:

> This is my 3rd or 4th request to receive long term mental health treatment e.g. a T.C.U. On Monday June 25th 2018 I was admitted to S.H.O.S. I, in fear of my safety, told staff i.e. mental health that I attempted to hang myself however, the real reason I declared a Psych Emergency was due to a P.R.E.A. issue that led to me being assaulted. I explained the situation to mental health but was discharged the next day. Once again due to my mental issues I[']m asking to be placed somewhere where I can receive adequate mental health treatment. This last incident has put me in a very dark place.

Doc. 62, Ex. 2 at 44.

Jackson states that he received the following injury from attempting to hang himself: "hurt my neck bad." Doc. 98, Ex. A, Pl.'s Aff. at 3. Jackson states that he received the following injuries from being assaulted: "head, back, neck and rib, eye swol[l]en, I lost hearing in my right ear and I have involuntary movement in my left hand from being hit and kicked in my head so many times." *Id*. at 3-4.

### III.  PLAINTIFF'S CLAIM AGAINST NURSE SHIVELY

Jackson claims that Shively was deliberately indifferent to his serious medical needs, namely, his  psychological emergency, his threat of self-harm, and his attempt at self-harm. Doc. 36 at 28, ¶ IV. Jackson asserts that Shively witnessed his attempt to hang himself, "and did nothing exemplifying deliberate indifference and neglect." Id., ¶ IV.

Page 11 of 24

Jackson seeks to hold Shively liable not only for the injuries that resulted from his attempt to hang himself, but also for the injuries he sustained from the subsequent inmate assaults. Doc. 36 at 10 and 28, ¶ IV. Jackson's complaint reasons that had Shively responded reasonably to his psychological emergency and threat of self-harm, he would have been taken to the medical department which would have thwarted the assaults Lanier orchestrated:

> I could have killed myself or could have been killed as a result of her not intervening and following protocol. I was assaulted and received several injuries due to her neglect.

*Id*. at 28, ¶ IV. As relief, Jackson seeks $80,000.00 in compensatory damages; $80,000.00 in punitive damages; and "any additional relief this Honorable Court deems Just and Proper." *Id*. at 22.[5]

---

[5] Jackson's response to Nurse Shively's motion for summary judgment states that Shively "is also liable for FAILURE TO INTERVENE, as she . . . 'stood by and watched' him being beaten." Doc. 98 at 2. Jackson did not plead a failure-to-protect claim in his third amended complaint. Jackson claimed only that Shively was deliberately indifferent to his psychological emergency and threat of self-harm. Doc. 36 at 28, ¶ IV.

Jackson, therefore, is foreclosed from raising this new theory of recovery in his response to the motion for summary judgment. *See, e.g., Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."); *Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227–28 (11th Cir. 2013) (refusing to consider claims raised for the first time in a plaintiff's response to a motion for summary judgment because, "[a]t the summary judgment stage, the proper procedure for

# IV. RELEVANT LEGAL STANDARDS

## A. __Summary Judgment Standard__

Rule 56 of the Federal Rules of Civil Procedure states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1303 (11th Cir. 2009). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A fact is "material"

---

plaintiffs to assert a new claim is to amend the complaint"); *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot."); *see also, e.g., King v. Marcy*, 809 F. App'x 764, 768 (11th Cir. 2020) ("[W]e have consistently held that a party may not raise a new claim for the first time in response to a summary judgment motion.") (internal quotation marks and citations omitted).

if it could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). In evaluating a summary judgment motion, all "justifiable inferences" must be resolved in the non-moving party's favor so long as there is a genuine dispute as to those facts. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.    <u>Eighth Amendment Standard</u>

"Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (citations omitted). "Prison [officials] who display deliberate indifference to the serious medical and psychiatric needs of a prisoner, or deliberate indifference to a 'strong likelihood' that a prisoner will take his own life, violate the Eighth Amendment and may be liable under section 1983." *Belcher*, 30 F.3d at 1396 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)) (other citations omitted). To hold a prison official liable under section 1983 for violating the Eighth Amendment, the plaintiff must satisfy three elements. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

First, the plaintiff must show that he had an objectively serious medical or psychiatric need. *Goebert*, 510 F.3d at 1326. "[A] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr*., 40 F.3d 1176, 1187 (11th Cir. 1994) (quotation omitted), *overruled in part on other grounds in Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002); *see also Andujar v. Rodriguez*, 486 F.3d 1199, 1203 (11th Cir. 2007) (same). "[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotation marks and citation omitted).

Second, to establish deliberate indifference, the prisoner "must establish both that (1) the defendant actually (subjectively) knew that the prisoner faced a substantial risk of serious harm and that (2) the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021) (alterations adopted) (internal quotation marks omitted); *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (applying same deliberate indifference standard to prisoner suicide claim); *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla*., 402 F.3d 1092, 1115 (11th Cir. 2005) (same). The likelihood of self-harm must be "a *strong likelihood* rather than a mere

possibility that the self-infliction of harm will occur." *Cook*, 402 F.3d at 1115 (internal quotation marks and citation omitted).

The Eleventh Circuit has explained: "To be deliberately indifferent to a strong likelihood that the prisoner will commit suicide, the official must be subjectively aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish*, 516 F.3d at 954–55; *see also Greffey v. State of Ala. Dep't of Corr.*, 996 F. Supp. 1368, 1382 (N.D. Ala. 1998) ("Case law indicates that a 'strong likelihood' of suicide does not exist . . . unless all of the following factors are present: (1) the inmate previously had threatened or attempted suicide; (2) that prior threat or attempt was known to the defendants; (3) the prior threat or attempt was somewhat recent; and, (4) the prior threat or attempt appeared genuine.").

"Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835-36 (11th Cir. 1990); *see Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("[A]cting or failing to act with deliberate

indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." *Goebert*, 510 F.3d at 1327. "Causation, of course, can be shown by personal participation in the constitutional violation." *Id*. at 1327.

## V.  DISCUSSION

### A.  Jackson Has Provided Enough Facts to Create a Triable Issue as to Whether He Had a Serious Medical/Mental-Health Need

Shively asserts that Jackson cannot establish the existence of an objectively serious medical/mental-health need or a substantial risk of self-harm. Shively interprets Jackson's after-the-fact communications to medical staff and in grievances as "conceding" that his psychological emergency and threat of self-harm was "fabricated in an attempt to help him avoid being assaulted by other prisoners [who were] part of a conspiracy involving correctional officers." Doc. 85 at 14. Shively concludes: "It is axiomatic that Plaintiff cannot deceitfully concoct a psychological emergency in order to take advantage of mental health treatment taking him out of the prison's general population to avoid contact with other inmates, and then turn around and argue he had a 'serious' medical need for mental health care or there was a 'strong likelihood' he was going to hurt or kill himself." *Id*. at 14-15.

Jackson does not dispute the statements attributed to him in his medical records, and he cannot dispute statements he wrote in his grievances. But that does not necessarily mean that summary judgment in Shively's favor is appropriate on the serious-medical-need prong of the Eighth Amendment standard. Reasonable minds viewing these undisputed statements in conjunction with the remaining summary judgment evidence—including Jackson's sworn allegations—might differ on the inferences arising from these facts.

Jackson has sworn—under penalty of perjury[6]—that he did not just *report* that he attempted to hang himself, he in fact attempted to hang himself after declaring a psychological emergency and threatening self-harm. In addition, the summary judgment record contains more than just Jackson's after-the-fact statements Shively identifies. The record also includes Jackson's diagnosed depression; Jackson's version of the events leading up to his hanging attempt; Jackson's description of the hanging attempt itself; and Jackson's mental health assessments after the incident.

Taking the summary judgment evidence in the light most favorable to Jackson, a reasonable jury could find that Jackson had a serious need for mental-

---

[6] The penalty for perjury in the judicial context is a fine and up to five years of imprisonment. *See* 18 U.S.C. § 1623.

health care as he contends. Summary judgment, therefore, is inappropriate on this element.

**B.**    **Jackson Has Provided Sufficient Facts to Create a Triable Issue as to Whether Shively Was Deliberately Indifferent to His Serious Medical/Mental-Health Need**

Shively also asserts that Jackson cannot prove that she had a sufficiently culpable state of mind, that is, deliberate indifference. Doc. 85 at 15. In support, Shively relies on her own affidavit wherein she states that (1) Jackson never told her that he was going to hang himself; (2) Jackson never told her that he was suicidal; and (3) she never had any other indication that Jackson had suicidal tendencies prior to June 25, 2018. *Id*. at 15. Shively also argues that because Jackson alleges that two correctional officers were in the pod and witnessed the same events, Jackson cannot prove that she had subjective knowledge that suicide was feasible in the context of Jackson's surroundings. *Id*. at 15-17.

Shively's argument fails on all points, because it ignores the fact that she was the medical professional on scene with immediate access to medical resources. Shively's argument also ignores Jackson's claims that his suicide attempt in her presence was preceded by his specific threat of suicide by hanging (voiced directly and exclusively to her), followed by his second specific threat of suicide by hanging

also while holding a bed sheet (voiced directly to her), followed by Jackson creating a ligature with the bed sheet and tying it around a TV stand (while Shively watched).

Additionally, in response to Jackson's first threat of self-harm, Shively allegedly exhorted him to make good on his threat—"Well hang then"—without any inquiry, assessment, or examination. After Jackson went to his cell, obtained a bed sheet, returned to Shively and again announced that he was going to hang himself, Shively laughed at Jackson. Shively then watched Jackson as he "tied the sheet around the TV Stand and then around [his] neck in an attempt to hang." Doc. 36 at 28, ¶ IV. Shively deliberately did not take any action.

Shively's final argument is that Jackson cannot prove that she denied him access to psychiatric or mental health care, because his medical records prove that he was seen under mental health emergency protocols less than two hours after he attempted to hang himself. Doc. 85 at 16, 19.  The fact that Jackson eventually received mental health care two hours after he threatened and attempted self-harm does not absolve Shively of liability for allegedly refusing to provide treatment at a point when she could have prevented Jackson's attempt to hang himself.

Taking the summary judgment evidence in the light most favorable to Jackson, a reasonable jury could find that (1) Shively was aware of a strong likelihood that Jackson would attempt to hang himself, and (2) she responded in a

dangerous way by gambling with his threat of suicide. This is sufficient to prove a claim of deliberate indifference. *See Farmer*, 511 U.S. at 842 ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite h[er] knowledge of a substantial risk of serious harm."); *accord Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1270 (11th Cir. 2005) (denying summary judgment to jail official where plaintiff presented sufficient evidence from which a jury could find that the official had subjective knowledge of a strong risk that detainee would attempt suicide, and deliberately did not take any action); *Turner v. Phillips*, 547 F. Supp. 3d 1188, 1204-06 (N.D. Fla. 2021), *aff'd*, No. 21-12370, 2022 WL 458238 (11th Cir. Feb. 15, 2022) (holding that the prisoner's evidence raised a reasonable inference that jail officials knew there was a strong likelihood he would attempt suicide—even when prisoner *denied* suicidal ideation—because officials saw the prisoner make an obvious instrument of suicide, a noose).

In sum, when the evidence is construed in the light most favorable to Jackson, a reasonable jury could find that Shively was deliberately indifferent to Jackson's serious medical need and threat of self-harm.

**C.** **Jackson Has Provided Sufficient Facts to Create a Triable Issue Regarding Causation**

Shively argues that Jackson is unable to prove causation between her deliberate indifference and his injuries "because of the intervening beat down he received by three inmates." Doc. 85 at 21. Shively explains that the only injuries Jackson alleges, and reported to medical personnel, were the physical injuries he sustained from the inmate assaults that occurred after he attempted to hang himself. *Id*. at 21-22. Shively concludes:

> As such, Plaintiff cannot show any alleged injuries from his purported suicide attempt were in fact caused by the suicide attempt as opposed to the beat down by three inmates, nonetheless can he show any of those injuries were the result of any conduct by Shively.

*Id*. at 22.

Jackson's third amended complaint alleges an affirmative causal connection between Shively's actions (or inaction) and the deprivation of his Eighth-Amendment right to adequate medical/psychiatric care. Jackson alleges that Shively personally denied him mental health attention and challenged him to follow through with his threat of self-harm, which caused him to attempt suicide and to suffer "paranoia, anxiety, depression" and a "severe neck injury." Doc. 36 at 10, 28; *see also* Doc. 77 at 12, ¶ 9 (Jackson's sworn statement that the "suicide attempt resulted in severe neck injuries . . . [and that] [t]he entire incident, as a whole, resulted in mental/emotional injuries.").

Page 22 of 24

Viewing the summary judgment evidence in the light most favorable to Jackson, a reasonable jury could find the required causal connection to hold Shively liable under § 1983 for violating Jackson's Eighth-Amendment right.

## VI. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.     Defendant Shively's motion for summary judgment, Doc. 85, be **DENIED**.

2.     This matter be returned to the undersigned for further pretrial proceedings on Plaintiff's individual-capacity Eighth-Amendment claim of medical deliberate indifference against Defendant Shively.

At Panama City, Florida, this <u>28th</u> day of March, 2022.

<u>/s/ *Michael J. Frank*</u>
**Michael J. Frank**
**United States Magistrate Judge**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and**

recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.